**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

<table>
<tr>
<td>

ADAM HOLDRIDGE, individually and as the representative of a class of similarly-situated persons,

*Plaintiff,*

v.

CLAY LABS, INC., a Delaware corporation,

*Defendant.*

</td>
<td>

Case No.:


**CLASS ACTION COMPLAINT**

</td>
</tr>
</table>

Plaintiff Adam Holdridge ("Holdridge" or "Plaintiff"), by and through his attorneys, brings this Class Action Complaint on behalf of himself and all other persons similarly situated and alleges the following against Defendant Clay Labs, Inc. ("Clay Labs" or "Defendant"):

## NATURE OF THE ACTION

1.      Plaintiff and members of the proposed class (the "Class" or "Class Members") seek statutory damages, an injunction, and other relief from Clay Labs for violations of the Colorado Prevention of Telemarketing Fraud Act ("PTFA"), Colo. Rev. Stat. § 6-1-304.

2.      On May 27, 2005, HB05-1288[1] was signed into law, amending PTFA to prohibit listing a cellular telephone number in a directory for a commercial purpose

---

[1] Colorado House Bill 05-1288, Final Act, https://www.leg.state.co.us/clics2005a/csl.nsf/fsbillcont3/1BB0D3E00348AC6987256F90007C20C7?open&file=1288_enr.pdf.

without affirmative consent. *See* Colo. Rev. Stat. § 6-1-304(4)(a)(I).[2] The amendment took effect on September 1, 2005. *Id*.

3.      This amendment to PTFA was designed to protect the privacy of cellular telephone numbers, as demonstrated by former Colorado State Representative Mark Cloer's public comments on the provision: "Most people view their cell phones as private. They give out the number to friends and family and some colleagues. When their cell phone rings, they expect it to be important. Most users would find a sales call to be an intrusion . . . ."[3]

4.      The Colorado legislature enacted subsection (4) of PTFA to specifically address privacy concerns of cellular telephone users and protect cellular telephone users from the misappropriation of their personal information, in keeping with the overall purpose of PTFA:

> The general assembly hereby finds, determines, and declares that the use of telephones for commercial solicitation is rapidly increasing; that this form of communication offers unique benefits, but entails special risks and poses the potential for abuse; that the general assembly finds that the widespread practice of fraudulent and deceptive commercial telephone solicitation has caused substantial financial losses to thousands of consumers, and, particularly, elderly, homebound, and otherwise vulnerable consumers, and is a matter vitally affecting the public interest; and, therefore, that the general welfare of the public and the protection of the integrity of the telemarketing industry requires statutory regulation of the commercial use of telephones.

Colo. Rev. Stat. § 6-1-301.

---

[2] Colorado House Committee on Business Affairs and Labor, Bill Summary for HB05-1288, https://www.leg.state.co.us/CLICS2005A/commsumm.nsf/IndSumm/574E34C489356ADA87256FB100612E60?.

[3] 9News, "Legislative Library: Feb. 23, 2005," https://www.9news.com/article/news/local/politics/legislative-library-feb-23-2005/73-344789916.

5.      Colo. Rev. Stat. § 6-1-304(4)(a) thus provides: "On or after September 1, 2005, a person commits an unlawful telemarketing practice if the person knowingly: (I) Lists a cellular telephone number in a directory for a commercial purpose unless the person whose number has been listed has given affirmative consent, through written, oral, or electronic means, to such listing . . . ."

6.      Clay Labs is a New York-based technology company incorporated in Delaware that operates an AI-powered go-to market data and workflow automation platform. The platform aggregates personal and professional information on individuals—including first and last name, work email, personal email, employer name, company location, phone number, and job title—giving sales and marketing professionals the tools to research prospects, build target contact lists, and launch personalized outreach campaigns at scale.[4]

7.      Users of Clay Labs' platform can search for and obtain personal information about individuals (many of whom are Colorado citizens) contained in Clay Labs' proprietary database, which Clay Labs augments with third-party sources.[5] This information is presented to the user as a profile, which categorizes the information in separate tabs. There are tabs for an individual's name, work email, personal email, employer, job title, and, most pertinent here, cellular telephone number. Users can search the profiles using various filters including name, company, job title, and location.

---

[4] Information from Clay Labs website, www.clay.com, last visited on June 11, 2026.

[5] According to its own website, Clay Labs "maintains proprietary databases containing data it has acquired from third parties." *See* https://trust.clay.com/faq, last visited on June 11, 2026.

8.      Clay Labs provides access to its directory of profiles for a subscription fee and uses the directory for marketing subscription sales. In other words, Clay Labs uses its directory, and the lists of cellular telephone numbers contained therein, for commercial purposes.

9.      Plaintiff and the Class have no relationship with Clay Labs. More importantly, Plaintiff and the Class never provided Clay Labs with affirmative consent to list their cellular telephone numbers in its directory.

10.     Despite failing to obtain affirmative consent from Plaintiff and the Class, Clay Labs nevertheless listed their cellular telephone numbers in its directory for commercial purposes in violation of PTFA.

11.     Plaintiff brings this action seeking an order (i) declaring that Clay Labs' conduct violates PTFA, (ii) requiring that Clay Labs cease the unlawful activities described herein; and (iii) awarding Plaintiff and the Class statutory damages in the amount of at least $300 and not more than $500.

## PARTIES

12.     Plaintiff Adam Holdridge is, and at all times relevant to this action has been, a citizen of Colorado residing in Denver, Colorado.

13.     Clay Labs, Inc., is a Delaware corporation with its principal place of business in New York. Clay Labs has created an AI-powered go-to market data and workflow automation platform that enables its users to search through its online directory of sales prospects and business contacts, and the list of cellular numbers associated with each, including the cellular telephone numbers of Plaintiff and thousands of other

4

Coloradans.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this case is a class action in which the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs; there are over 100 members in the putative class; and at least one Plaintiff is a citizen of a different state than Defendant, satisfying CAFA's minimum diversity requirement.

15.     This Court has personal jurisdiction over Clay Labs because Clay Labs regularly transacts business in Colorado and a substantial part of the events giving rise to the claims asserted herein occurred in Colorado. Clay Labs' wrongful conduct— knowingly listing the cellular telephone numbers of thousands of Coloradans in its directory, including Plaintiff's, without requesting or receiving those individuals' affirmative consent—caused injury in Colorado and to Colorado residents.

16.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Clay Labs conducts significant business transactions within this District and because the wrongful conduct giving rise to this action occurred in and was directed to this District. Venue is additionally proper because Plaintiff resides in Denver, Colorado, which is located within this District.

## FACTUAL ALLEGATIONS

### Clay Labs' Directory

17.     Clay Labs is a technology company founded in 2017. Clay Labs is

registered as a data broker in California, Nevada, Oregon, Texas, and Vermont. [6]  As a data broker, Clay Labs "collect[s] consumers' personal information and resell[s] or share[s] that information with others[.]"[7]

18.    Clay Labs operates an AI powered go-to-market data and workflow automation platform. Clay Labs' platform provides sales and marketing professionals access to its proprietary database and tools to automate prospect research, enrich contact and firmographic data, and build personalized outreach workflows.

19.    Clay Labs' platform is marketed as a tool to help businesses "find[  ] and reach[  ] customers" by combining "1st-party data, intent data, and 3rd-party data from 100+ external enrichments in one place for people to do deep customer research."[8]

20.    Clay Labs' platform allows users to search for individuals in its database and obtain access to their identifying information.

21.    The information for a given individual on the platform is presented as a profile. The profiles are divided into separate tabs to delineate the information available for each person. For instance, there are tabs for first and last name, job title, employer, and location.

22.    The platform enables users to search and filter for individuals by name, company, job title, location, and other criteria. The platform also allows users to augment

---

[6] *See,* https://trust.clay.com/faq, last visited on June 11, 2026.

[7] FTC, "Data Brokers: A Call for Transparency and Accountability," https://www.ftc.gov/system/files/documents/reports/data-brokers-call-transparency-accountability-report-federal-trade-commission-may-2014/140527databrokerreport.pdf, last visited on June 15, 2026.

[8] *See,* www.clay.com/about, last visited on June 15, 2026.

or "enrich" this information with third-party data.

23.     Users can save search results to lists that are maintained on the platform. Users can then use these lists for their own marketing and outreach purposes with the tools provided to them by the platform.

24.     The platform provides a tab for cellular telephone numbers (referred to as "mobile phone") for listed profiles. A paid subscription is needed to access these numbers. Clay Labs refers to the retrieval of mobile phone numbers as an "enrichment."

25.     Clay Labs provides new users with four separate options to access its platform—a very limited free version and three other paid subscription versions, each offering varying levels of functionality and data access based on the subscription prices. For each version of platform access, Clay Labs offers a 14-day free trial.

26.      Access to cellular telephone numbers is not allowed during any of the free trials or the free version. As stated, a user must first enter into a paid subscription to access information regarding cellular telephones in the directory. Any attempt by a user during a free trial to "enrich" the mobile number tab is met with a signal from the platform that such action requires a paid subscription.

27.     Clay Labs knows that it offers cellular telephone numbers as part of the information provided for the profiles it maintains in its database. This includes the cellular telephone numbers of many Coloradans. As discussed, the platform enables targeted geographic searches for individuals, including individuals residing in Colorado, and provides the option to populate those profiles with cellular telephone numbers by selecting the "mobile phone" tab.

28.     Clay Labs uses the cellular numbers of individuals maintained in its directory, including those residing in Colorado, to entice users to enter into paid subscriptions to the platform.

29.     Further, Clay Labs' entire business model is based on selling access to individuals profiled in its directory to sales professionals. To enhance the appeal of this access, Clay Labs enables users to acquire cellular telephone numbers of Coloradans and others with the lists of profiles in its database, which is paid for through subscription costs.

30.     Clay Labs has two clear commercial uses for providing access to the cellular numbers of Plaintiff and thousands of other Coloradans profiled in its database: (i) as advertising for its platform and directory; and (ii) as a service exchanged for a paid subscription for use of the platform and ability to search the directory.

31.     Clay Labs' use of cellular numbers in this manner demonstrates that those numbers have value. Clay Labs' business model is dependent on providing access to potential customers, and cellular telephone numbers are an essential component of that access. Indeed, Clay Labs' targeted subscribers, sales and marketing professionals, pay subscription fees for this access. Thus, Clay Lab derives value through the accumulation of cellular telephone numbers for its platform.

32.     Despite listing Plaintiff's and other Class Members' cellular telephone numbers in its directory, and using those numbers for commercial purposes, Clay Labs never requested or obtained consent to do so.

8

**Clay Labs' Conduct Harms Coloradans**

33.    Clay Labs' misappropriation of Plaintiff's and thousands of other Coloradans' cellular telephone numbers deprives these individuals from the real, quantifiable value of their data, exposes them to heightened risks of fraud and invasion of privacy, and deprives them of their rights under PTFA.

34.    Coloradans regularly suffer abuse from parties who misuse cellular telephone numbers made available through data brokers like Clay Labs. For example, the Federal Trade Commission's FY2024 National Do Not Call Registry Data Book shows that Colorado ranks tenth among all states in complaints per state resident (41,173 complaints; 719 complaints per 100,000). The large majority of complaints from Colorado are complaints about robocalls, and the leading complaint topic reported by Coloradans is "Imposters"—calls in which the caller fraudulently purports to be someone else.[9] According to one report, "Coloradans received 291.1 million scam or unwanted robocalls from January through September of [2025]."[10]

35.    In addition, the Colorado Governor's Office of Information and Technology has been warning Coloradans about "Smishing," which is "a form of social engineering that uses text messages (SMS) to trick you into giving up personal data or clicking on malicious links. The goal is usually to steal your passwords, credit card details or other

---

[9]    Fed. Trade Comm'n, The National Do Not Call Registry Data Book (Nov. 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/DNC-Data-Book-2024.pdf.

[10]    *Spam robocalls hit 6-year high as fewer phone companies protect us*, CoPIRG Found. (Oct. 16, 2025), https://pirg.org/colorado/foundation/media-center/spam-robocalls-hit-6-year-high-as-fewer-phone-companies-protect-us/.

sensitive information."[11] Clay Labs makes "Smishing" attacks easier by making Coloradans' cell phone numbers and other personal information available for a price or as part of an advertising effort (*e.g.*, during the "free trial" period).

36.     There are additional harms inherent in having one's personal data misappropriated by online directories and data broker sites. Phone scams are one common example, in which scammers employ various methods to cheat people out of money by taking their payment information and other personal details over the phone. The FTC warns consumers about numerous categories of common phone scams, including: (1) impersonator scams that involve pretending to be a government agency or a loved one; (2) debt relief and credit repair scams, in which scammers offer to lower credit card interest rates, fix credit scores, or forgive student loans; (3) business and investment scams, in which scammers promise to help individuals start their own businesses or guarantee profits from investments; (4) charity scams, in which scammers pose as real charities and ask for fraudulent donations for disaster relief or local law enforcement; (5) extended car warranty scams; (6) "free trial" scams; (7) loan scams; (8) prize and lottery scams; and (9) travel scams and timeshare scams.[12]

37.     Scams and the misappropriation of personal data extracted from the Internet have been directly linked to people search sites and directories like the one

---

[11] Governor's Office of Information Technology, Have You Been Smished? (Nov. 7, 2024), https://oit.colorado.gov/blog-post/have-you-been-smished.

[12] FTC Consumer Advice, "Phone Scams," https://consumer.ftc.gov/articles/phone-scams.

maintained by Clay Labs.[13] And beyond financial scams, the misappropriation of personal data and contact information can even potentially increase the risk of victimization by stalkers and perpetrators of domestic violence and other forms of abuse.[14]

38.     A Federal Trade Commission ("FTC") report on Data Brokers succinctly outlines the many risks inherent in misappropriating personal information of consumers, as Clay Labs has done here:

> There are a number of potential risks to consumers from data brokers' collection and use of consumer data . … [T]hey may facilitate the sending of advertisements … which some consumers may find troubling and which could undermine their trust in the marketplace. Moreover, … people search products can be used to facilitate harassment, or even stalking, and may expose domestic violence victims, law enforcement officers, prosecutors, public officials, or other individuals to retaliation or other harm.[15]

39.     The harms described above are exacerbated by the growing technical capabilities of criminals who have developed the ability to contact cellular telephone numbers on an unprecedented scale. In recent years, criminal operators have deployed

---

[13] *See, e.g.*, Consumer Reports, "Evaluating People-Search Site Removal Services," https://innovation.consumerreports.org/Data-Defense_-Evaluating-People-Search-Site-Removal-Services-.pdf ("People-search sites put ordinary people at risk of fraud, identity theft, scams, and even stalking and other forms of harassment."); Fox News, "The dangerous intersection of people search sites and scams," https://www.foxnews.com/tech/dangerous-intersection-people-search-sites-scams (outlining how people search sites can enable scammers to find victims, create detailed profiles of individuals, and launch targeted phishing attacks to probe for sensitive information).

[14] *See, e.g.*, Voices of Women, "The Dangers of People Search Sites," https://vownow.org/2020/10/the-dangers-of-people-search-sites/; FTC, "Data Brokers: A Call for Transparency and Accountability," https://www.ftc.gov/system/files/documents/reports/data-brokers-call-transparency-accountability-report-federal-trade-commission-may-2014/140527databrokerreport.pdf.

[15] FTC, "Data Brokers: A Call for Transparency and Accountability," https://www.ftc.gov/system/files/documents/reports/data-brokers-call-transparency-accountability-report-federal-trade-commission-may-2014/140527databrokerreport.pdf.

so-called "SIM farms"—large collections of centrally managed SIM cards housed in SIM boxes and controlled by servers—to carry out high-volume spam, fraud, and other attacks that directly harm individuals. By way of example, the U.S. Secret Service recently identified a New York-area operation that a law enforcement source reported "could be used to send approximately 30 million text messages per minute, meaning it could anonymously text the entire United States in around 12 minutes."[16]

40.    Access to cellular telephone numbers in conjunction with other personally identifying information enables devastating forms of fraud. One serious emerging threat is "SIM swapping," in which criminal actors impersonate a victim to trick a mobile carrier into transferring the victim's telephone number to a SIM card controlled by the attacker. Once the SIM is reassigned, the attacker receives the victim's calls and text messages and can intercept one-time passcodes or account-recovery messages sent via SMS. Since many online services reply on SMS-based authentication or password-reset links, a successful SIM-swap enables attackers to bypass those protections and take control of email, financial, and other online accounts, causing significant financial loss and invasion of privacy.[17] SIM swapping is only possible when criminals obtain information regarding victims' cell phone numbers and other personal information through services

---

[16] Andy Greenberg, Lily Hay Newman & Matt Burgess, " 'SIM Farms' Are a Spam Plague. A Giant One in New York Threatened U.S. Infrastructure, Feds Say," WIRED (Sept. 23, 2025), https://www.wired.com/story/sim-farm-new-york-threatened-us-infrastructure-feds-say/.

[17] Fed. Bureau of Investigation, Internet Crime Complaint Ctr., Criminals Increasing SIM Swap Schemes to Steal Millions of Dollars from U.S. Public, Alert No. I-020822-PSA (Feb. 8, 2022), https://www.ic3.gov/PSA/2022/PSA220208.

like Clay Labs.

## Plaintiff's Experience

41.    Plaintiff is a citizen and resident of Colorado and maintains a cellular telephone number.

42.    As of June 2026, Clay Labs was displaying a profile of Plaintiff, with populated tabs for his name, job title, location, company domain, LinkedIn profile, and mobile number. See image below.



43.    Through this listing, paid users of the platform could place marketing and sales calls to Plaintiff's cellular telephone number.

44.    Clay Labs holds out Plaintiff's profile, which includes his cellular telephone number, to charge users of its platform for access to its database and for advertising purposes.

45.    Clay Labs knowingly listed Plaintiff's cellular telephone number in its database.  As shown in the image above, Plaintiff's cellular telephone number is explicitly tabbed as a "mobile number" on Clay Labs' platform.

46.    Plaintiff does not subscribe for access to Clay Labs' directory. In fact, Plaintiff has no relationship with Clay Labs whatsoever.

47.    Clay Labs never requested—and Plaintiff never provided—affirmative consent to the listing of his cellular telephone number by Clay Labs in its directory, by written, oral, electronic, or other means.

48.    Plaintiff had no reasonable ability to discover Clay Labs' use of his cellular telephone number until shortly before filing the present action.

49.    Plaintiff has privacy and property interests in his cellular telephone number. Plaintiff has the right to exclude companies like Clay Labs from using or taking advantage of these interests without his consent.

50.    Clay Labs knowing and deliberate use of Plaintiff's cellular telephone number for advertising and enhancing the value of its platform is misleading in that it gives the false impression that Plaintiff is a willing participant in the platform, which he is not, and that he wants to receive unsolicited communications from sales and marketing professionals, which he does not.

51.    Clay Labs' use of Plaintiff's cellular number in this manner demonstrates that it has value. Clay Labs' business model is dependent on providing access to potential customers, and cellular numbers are an essential component of that access. Clay Labs derives value through the accumulation of cellular telephone numbers, including Plaintiff's cellular telephone number, for its platform by (i) charging subscribers a monthly or yearly fee for access to those numbers, and (ii) using the same numbers for marketing purposes.

52.    Clay Labs injured Plaintiff by knowingly using his cellular telephone number for its own commercial purposes without consent as recognized by PTFA.

## CLASS ALLEGATIONS

53.    Plaintiff brings this action under Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and a class of similarly situated individuals (the "Class" or "Class Members"), defined as follows:

> All persons who were Colorado residents on or before three (3) years prior to the filing of this complaint whose cellular telephone numbers were listed by Clay Labs in its for-profit directory.

54.    The following people are excluded from the Class: (i) any Judge presiding over this action and members of his or her family; (ii) Clay Labs, Clay Labs' subsidiaries, parents, successors, predecessors, and any entity in which Clay Labs or its parents have a controlling interest (including current and former employees, officers, or directors); (iii) persons who properly execute and file a timely request for exclusion from the Class; (iv) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (v) Plaintiff's counsel and Clay Labs' counsel; and (vi) the legal representatives, successors, and assigns of any such excluded persons.

55.    Plaintiff reserves the right to modify the Class definition, including by using subclasses, as appropriate, based on further investigation and discovery obtained in the action.

56.    ***Numerosity* (Fed. R. Civ. P. 23(a)(1)).** Members of the Class are so numerous that joinder of all Class Members is impractical. Based on refined searches conducted on the Clay Labs directory, the number of persons in the class is estimated to be in the thousands. Additionally, the size and relatively modest value of the claims of the individual members of the Class renders joinder impractical.

15

57.     ***Commonality* (Fed. R. Civ. P. 23(a)(2))**. A well-defined community of interest exists in the questions of law and fact involved in this action. Questions of law and fact common to the members of the Class that predominate over questions affecting only individual Class Members include, but are not limited to, the following:

(a)     Whether Clay Labs violated Colo. Rev. Stat. § 6-1-304(a)(I); and

(b)     Whether Plaintiff and Class Members are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of the suit, pursuant to Colo. Rev. Stat. § 6-1-305(1)(c).

58.     ***Typicality* (Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, had his cellular telephone number collected and listed on the Clay Labs directory for a commercial purpose; Clay Labs collected and listed Plaintiff's cellular telephone number on the directory without Plaintiff's affirmative consent (either written, oral, electronic, or by other means); and Clay Labs' misappropriation of Plaintiff's personal data (including its economic value) was at the expense of Plaintiff's PTFA privacy rights.

59.     ***Adequacy* (Fed. R. Civ. P. 23(a)(4).** Plaintiff will adequately safeguard the interests of the Class Members, as Plaintiff's interests align with, and do not conflict with those of the Class. Plaintiff's counsel has experience in handling class action litigation, including consumer privacy. The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

60.     ***Injunctive and/or Declaratory Relief* (Fed. R. Civ. P. 23(b)(2)).** As

16

demonstrated above, Clay Labs has acted on grounds generally applicable to the proposed Class such that declaratory and final injunctive relief are appropriate with respect to the Class.

61. ***Predominance and Superiority*** (**Fed. R. Civ. P. 23(b)(3))**.  Common questions of law and fact predominate over any questions affecting only individual members, and a class action is superior to other methods for the fair and efficient adjudication of the controversy because:

(a)  Proof of Clay Labs' liability on Plaintiff's claims will also prove liability for the claims of the Class without the need for individualized proceedings;

(b)  Evidence regarding defenses or any exceptions to liability that Clay Labs may assert and attempt to prove will come from Clay Labs's records and will not require individualized or separate inquiries or proceedings;

(c)  Clay Labs has acted and is continuing to act pursuant to common policies or practices in the same or similar manner with respect to all Class Members;

(d)  The injury suffered by each Class Member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions against Clay Labs economically feasible. Even if Class Members could afford individual litigation, those actions would put immeasurable strain on the court system. A class action, on the other hand, will permit a large number of claims involving virtually identical facts and

legal issues to be resolved efficiently in one proceeding based upon common proofs without the risk of inconsistent judgments;

(e)   This case is inherently manageable as a class action in that: (i) Clay Labs's records will enable Plaintiff to readily identify Class Members and establish liability and damages; (ii) liability and damages can be established for Plaintiff and the Class with the same common proofs; (iii) a class action will result in an orderly and expeditious administration of claims, fostering economies of time, effort, and expense; (iv) a class action will contribute to uniformity of decisions concerning Clay Labs's practices; and (v) as a practical matter, the claims of each Class Member are likely to go unaddressed absent class certification.

## **CAUSE OF ACTION**

**Violation of the Prevention of Telemarketing Fraud Act**
**(Colo. Rev. Stat. § 6-1-304(4)(a)(I))**
**(On Behalf of Plaintiff and the Class)**

62.    Plaintiff incorporates the above paragraphs by reference as if fully stated herein.

63.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Clay Labs.

64.    Colo. Rev. Stat. § 6-1-304(4) provides:

(a)    On or after September 1, 2005, a person commits an unlawful telemarketing practice if the person knowingly:

(I)    Lists a cellular telephone number in a directory for a commercial purpose unless the person whose number has

18

been listed has given affirmative consent, through written, oral, or electronic means, to such listing[.]

65. Clay Labs knowingly lists Plaintiff's and other Coloradans' cell phone numbers in its directory.

66. A "directory," according to Oxford Learner's Dictionaries, is a "book or electronic resource containing lists of information . . . for example people's phone numbers or the names and addresses of businesses in a particular area."[18]

67. Clay Labs's platform offers access to a directory of profiles wherein cellular telephone numbers are listed. Clay Labs' platform allows users to search its proprietary database of individual profiles. These profiles can be categorized and filtered by name, company, job title, location, and other criteria. They can also be subcategorized into lists by individual users of the platform. The profiles, in turn, contain a tab for mobile numbers, which can be accessed by paying users.

68. Clay Labs lists Plaintiff's cellular telephone numbers in its directory for two distinct commercial purposes: first, as part of a marketing plan to entice potential customers to enter into subscriptions for access to its directory; and second, as part of the product it provides access to users for a cost.

69. Clay Labs never requested "affirmative consent, through written, oral, or electronic means" from Plaintiff or other Class Members to list their cellular telephone

---

[18] Oxford Learner's Dictionaries, "Directory," https://www.oxfordlearnersdictionaries.com/definition/english/directory; *see also* Cambridge, "Directory," https://dictionary.cambridge.org/us/dictionary/english-italian/directory#google_vignette (defining a "directory" as "a book or list of names and numbers").

numbers. Colo. Rev. Stat. § 6-1-304(4)(a)(I). Rather, Clay Labs routinely lists the cellular telephone numbers of Coloradans they have never engaged with, have had no connection or relationship to, and who are completely unaware of Clay Labs.

70.    Clay Labs' misappropriation of Plaintiff's and Class Members' personal data (including its economic value) comes at the expense of Plaintiff's and Class Members' rights under PTFA. Clay Labs' conduct deprived Plaintiff and Class Members of the real, quantifiable value of their data, and it exposed Plaintiff and Class Members to elevated risks of harassment, stalking, scams, identity theft, and unwanted telemarketing calls.

71.    Thus, on behalf of himself and the Class, Plaintiff seeks: (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class; (3) damages, pursuant to Colo. Rev. Stat. § 6-1-305(1)(c), of at least three hundred dollars ($300) and not more than five hundred dollars ($500) for each first offense, and at least five hundred dollars ($500) and not more than one thousand dollars ($1,000) for each second or subsequent offense; and (4) reasonable attorneys' fees and other litigation costs pursuant to Colo. Rev. Stat. § 6-1-305(a)(c).

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of himself and the proposed Class, respectfully requests that this Court grant judgment against Clay Labs as follows:

   (a)    An order certifying the Class, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b)    An order declaring that Clay Labs's conduct, as described above, violates Colo. Rev. Stat. § 6-1-304(4)(a)(I);

(c)    An order awarding Plaintiff and Class Members statutory damages pursuant to Colo. Rev. Stat. § 6-1-305(1)(c), of at least three hundred dollars ($300) and not more than five hundred dollars ($500) for each first offense, and at least five hundred dollars ($500) and not more than one thousand dollars ($1,000) for each second or subsequent offense;

(d)    An order awarding injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and the Class, including *inter alia*, an Order requiring Clay Labs to comply with PTFA;

(e)    An order awarding Plaintiff and the Class their reasonable attorney's fees and expenses and costs of suit pursuant to Colo. Rev. Stat. § 6-1-305(1)(c);

(f)    An order awarding Plaintiff and the Class pre- and post-judgment interest, to the extent allowable; and

(g)    An order awarding such other and/or further relief as the Court may deem just and proper.

Dated: June 18, 2026

Respectfully submitted,

Adam Holdridge, individually and as the representative of a class of similarly-situated persons,

*/s/ Patrick J. Solberg*

Patrick J. Solberg
Wallace C. Solberg
ANDERSON + WANCA
3701 Algonquin Road, Suite 500
Rolling Meadows, IL 60008
Telephone: (847) 368-1500
psolberg@andersonwanca.com
wsolberg@andersonwanca.com

21